O

# United States District Court
# Central District of California

| | |
|---|---|
| OPPENHEIMER & CO. INC.,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>STEVEN GINN, *as Trustee of the Ginn Hopkins Charitable Remainder Unitrust*,<br><br>　　　　Defendant. | Case № 2:23-cv-02994-ODW (SKx)<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION [16]** |

## I.   INTRODUCTION

Plaintiff Oppenheimer & Co. Inc. brings this action seeking declaratory and injunctive relief against Defendant Steven Ginn ("Ginn"), in his capacity as Trustee of the Ginn Hopkins Charitable Remainder Unitrust ("Ginn Trust"), with respect to Financial Industry Regulatory Authority ("FINRA") arbitration, case no. 22-02114 ("FINRA Arbitration").  (*See* Compl. ¶ 1, ECF No. 1.)  Oppenheimer moves for a preliminary injunction to enjoin Ginn from arbitrating claims against Oppenheimer in the FINRA Arbitration.  (Mot. Prelim Inj. ("Mot." or "Motion") 1–5, ECF No. 16-1.)  For the reasons that follow, the Court **GRANTS** the Motion.[1]

---

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II. BACKGROUND

### A. FINRA Arbitration

In September 2022, Ginn and other claimants (non-parties here) filed a Statement of Claim ("Statement" or "SOC") with FINRA, initiating the FINRA Arbitration against Oppenheimer. (Compl. ¶ 11; Decl. William E. Mahoney, Jr. ISO Mot. ("Mahoney Decl.") ¶ 3, Ex. A ("SOC"), ECF No. 16-3.[2]) In the Statement, Ginn alleges that, in 2016, the Ginn Trust invested $400,000 in Horizon Private Equity III LLC. (Compl. ¶ 13; SOC 2–3.) Ginn made the investment on the advice of financial advisors with Southport Capital, a company owned by non-party John Woods. (Decl. Steven Ginn ISO Opp'n ("Ginn Decl.") ¶¶ 8–9, ECF No. 28-1; SOC 10.) Ginn alleges Horizon was a Ponzi scheme that Woods orchestrated through Southport Capital. (Compl. ¶ 14; SOC 10.) The Ginn Trust lost over $300,000. (SOC 2–3.)

From 1991 to 2016, Woods was also an Oppenheimer employee. (Compl. ¶ 14.) In the FINRA Arbitration, Ginn asserts claims against Oppenheimer for failure to supervise Woods's "undisclosed outside business activity" and respondeat superior liability for Woods's misconduct, among others. (SOC 10; *id.* at 7–17; Compl. ¶ 15.) Neither Woods nor Southport Capital is a party to the FINRA Arbitration. (*See* Compl. ¶ 14; SOC.)

### B. This Litigation

Oppenheimer brings this suit against Ginn for declaratory and injunctive relief concerning the FINRA Arbitration. (Compl., Prayer for Relief ¶¶ A–B.) FINRA Rule 12200 requires FINRA members like Oppenheimer to arbitrate its customer's disputes if a written agreement requires arbitration or the customer requests it. (*Id.* ¶ 46 (quoting FINRA Rule 12200).[3]) Oppenheimer alleges that, while it is a FINRA

---

[2] The Statement is incorporated by reference into the Complaint. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); (Compl. ¶¶ 11–15).

[3] Oppenheimer requests judicial notice of three FINRA Rules, including FINRA Rule 12200. (Req. Judicial Notice, ECF No. 17.) The Court denies this request because it need not judicially notice the FINRA Rules to consider them. This Court is bound to follow Ninth Circuit precedent, and the

1  member, no written agreement of any kind exists between Oppenheimer and Ginn or
2  the Ginn Trust, and neither Ginn nor the Ginn Trust have ever been a "customer" of
3  Oppenheimer as defined in FINRA Rule 12200.  (*Id.* ¶¶ 6, 48–51, 54–55.)
4  Accordingly, Oppenheimer seeks to enjoin Ginn from arbitrating against
5  Oppenheimer in the FINRA Arbitration. (*Id.*, Prayer for Relief ¶¶ A–B.)

6  As the final evidentiary hearings in the FINRA Arbitration are scheduled for
7  September 2023, (Mahoney Decl. ¶ 5), Oppenheimer moves to preliminarily enjoin
8  Ginn from arbitrating against Oppenheimer in the FINRA Arbitration, (Mot. 1). The
9  Motion is fully briefed. (Opp'n, ECF No. 28; Reply, ECF No. 30.)[4]

### III.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a movant must establish that they are likely to succeed on the merits, they are likely to suffer irreparable harm absent an injunction, the balance of equities tips in their favor, and an injunction is in the public interest. *Goldman*, 747 F.3d at 738 (citing *Winter*, 555 U.S. at 20). The party moving for the preliminary injunction must make a "clear showing" that the preliminary injunction is warranted. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003).

---

Ninth Circuit has analyzed and applied FINRA Rule 12200. *See Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 739–41 (9th Cir. 2014).

[4] Oppenheimer objects to the Declaration of Philip L. Vujanov, submitted in support of Ginn's opposition. (Obj. Evid., ECF No. 29; Decl. Philip L. Vujanov ISO Opp'n ("Vujanov Decl."), ECF No. 28-2.) Vujanov fails to support any fact with personal knowledge, fails to authenticate or identify attached exhibits, and relies on impermissible hearsay and legal conclusions. Nevertheless, these are curable defects, and even if they were not, the Court may consider evidence that would not be admissible at trial in ruling on a motion for preliminary injunction. *See, e.g.*, *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." (quoting *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984))). That said, having considered Vujanov's Declaration, the Court finds it adds nothing material and thus is unnecessary to the disposition of this Motion. As such, the Court overrules Oppenheimer's objections as moot.

## IV. DISCUSSION

Oppenheimer argues a preliminary injunction is appropriate here because (1) Oppenheimer is likely to succeed on the merits of its claim that it is not required to arbitrate Ginn's claims against Oppenheimer in the FINRA Arbitration; (2) it will suffer irreparable harm if forced to arbitrate when it is not obligated; (3) the equities weigh in Oppenheimer's favor; and (4) an injunction serves the public interest in protecting a party's access to court where there is no agreement to arbitrate. (Mot. 5.)

### A. Likelihood of Success on the Merits

To succeed on the merits of its claim for declaratory relief, Oppenheimer must show that no agreement to arbitrate exists between Oppenheimer and Ginn and that Ginn was not an Oppenheimer "customer" under FINRA Rule 12200. (*See* Compl. ¶¶ 62–64.) Ginn does not dispute the lack of a separate written agreement to arbitrate, but argues that he is an Oppenheimer "customer" under FINRA Rule 12200 and may thus compel Oppenheimer to arbitrate. (Opp'n 7–18.)

*1. Arbitration*

"Arbitration is a matter of contract." *Goldman*, 747 F.3d at 739 (alteration omitted) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). There is a liberal policy favoring arbitration agreements. *Id.* (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). However, where the question is whether an agreement to arbitrate exists, the policy favoring arbitration does not apply. *See id.* at 742. It is for the court to decide whether an agreement to arbitrate exists, as well as which issues are arbitrable, unless the parties "clearly and unmistakably" agreed otherwise. *See id.* at 738 (emphasis omitted) (citing *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013)).

*2. FINRA Rule 12200*

"FINRA is a self-regulatory organization that has the authority to exercise comprehensive oversight over all securities firms that do business with the public." *Id.* at 737 (internal quotation marks omitted). "To exercise this oversight, FINRA has

instituted rules with which its members . . . agree to comply." *Id.* FINRA Rule 12200 is one such rule; it provides that FINRA members and their customers "must arbitrate a dispute" if three requirements are satisfied. *See* FINRA Rule 12200, https://www.finra.org/rules-guidance/rulebooks/finra-rules/12200 (last visited Aug. 4, 2023). First, arbitration must be required by a written agreement or requested by a FINRA member customer. *Id.* Second, the dispute must be "between a customer and a member or associated person of a member." *Id.* Finally, the dispute must arise "in connection with the business activities of the member or the associated person." *Id.*

In *Goldman*, the Ninth Circuit observed that FINRA Rule 12200 operates as an agreement by its members "to arbitrate disputes arising out of their business activities at the request of a 'customer.'" 747 F.3d at 739. However, FINRA Rules define "customer" only in the negative, as "not includ[ing] a broker or dealer." *Id.* (quoting FINRA Rule 12100(i)). Finding this definition unhelpful in determining whether an appellant qualified as a "customer," the Ninth Circuit looked to other courts' analyses of the term. *Id.* at 739–41. Ultimately, the Ninth Circuit concluded that a "customer" for purposes of FINRA Rule 12200 is "a non-broker and non-dealer who purchases commodities or services from a FINRA member in the course of the member's FINRA-regulated business activities, i.e., the member's investment banking and securities business activities." *Id.* at 741.

In adopting this definition, the Ninth Circuit found persuasive the reasoning of the Fourth and Second Circuits. *Id.* at 740–41 (first discussing *UBS Fin. Servs. v. Carilion Clinic*, 706 F.3d 319, 327 (4th Cir. 2013); and then discussing *UBS Fin. Servs. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 650 (2d Cir. 2011)). Subsequent decisions by these Circuits have further restrained the definition of "customer." For instance, in *Citigroup Glob. Mkts. v. Abbar*, the Second Circuit held that "[t]he only relevant inquiry in assessing the existence of a customer relationship is whether an account was opened or a purchase made." 761 F.3d 268, 276 (2d Cir. 2014); *see also*

*Raymond James Fin. Servs. v. Cary*, 709 F.3d 382, 388 (4th Cir. 2013) (defining "customer" as one "who purchases commodities or services from a FINRA member").

3. Analysis—"Customer"

Applying the Ninth Circuit's definition of "customer," the issue here is whether Ginn "purchase[d] commodities or services from" Oppenheimer "in the course of [Oppenheimer's] FINRA-regulated business activities." *See Goldman*, 747 F.3d at 741. The answer is no. Ginn invested in Horizon through Southport Capital, not Oppenheimer, on the advice of "Southport Capital financial advisor[s] Lynne Witmer and Georgette DiPalma." (Ginn Decl. ¶ 8.) Although Woods was a registered Oppenheimer broker at the time Ginn invested in Horizon, Woods operated the Horizon investment program through Southport Capital, not Oppenheimer. (SOC 10 ("Woods sold Horizon through another undisclosed outside business activity: Southport Capital.").) The record contains no evidence that Witmer, DiPalma, or Southport Capital were ever affiliated with Oppenheimer. And Ginn concedes the Ginn Trust never had an account with or received an account statement from Oppenheimer. (*See* Compl. ¶¶ 21–30; Answer ¶¶ 21–30, ECF No. 21 (admitting these allegations).) Thus, Ginn is not a "customer" of Oppenheimer under the Ninth Circuit's definition because he did not "purchase[] commodities or services from a FINRA member." *Goldman*, 747 F.3d at 741.[5]

Ginn argues that he is a customer of Oppenheimer because he purchased the Horizon investment from Woods, and Woods was an "associated person of" Oppenheimer at the time of Ginn's Horizon investment. (Opp'n 8–17.) Although some courts in the Ninth Circuit have entertained the possibility that "an investor who purchases commodities or services from a FINRA member's 'associated person' may

---

[5] The same result obtains under decisions of other Circuits from which the Ninth Circuit derived its definition. Ginn is not an Oppenheimer customer under the Fourth Circuit's definition because he did not "purchase[] commodities or services from" Oppenheimer. *See Cary*, 709 F.3d at 388; *Carilion Clinic*, 706 F.3d at 327. Similarly, Ginn is not an Oppenheimer customer under the Second Circuit's bright line test, because Ginn neither opened an account with Oppenheimer nor purchased commodities or services from Oppenheimer. *See Abbar*, 761 F.3d at 276.

also qualify as a 'customer,'" see *Oppenheimer & Co. Inc. v. Mitchell*, No. C23-67 MJP, 2023 WL 2428404, at *4 (W.D. Wash. Mar. 9, 2023), the Court is not persuaded that the Ninth Circuit would endorse this expanded definition. However, even accepting Ginn's argument, and extending the Ninth Circuit's definition to include "purchases commodities or services from a FINRA member <u>or its associated person</u>, in the course of the member's FINRA-regulated business activities," the evidence here is inadequate to establish that Ginn purchased his investment in Horizon from Woods (1) as an Oppenheimer-associated person, or (2) in the course of Oppenheimer's FINRA-regulated business activities.

  First, there is no evidence that Ginn purchased his investment in Horizon from Woods, either directly or as an Oppenheimer-associated person. Ginn alleges he purchased his investment from Southport Capital, on advice from Southport's financial advisors DiPalma and Witmer. (Ginn Decl. ¶ 8.) No evidence suggests that Southport Capital, DiPalma, or Witmer had any affiliation with Oppenheimer. Ginn also asserts that Woods operated Southport Capital as an "outside business," undisclosed to Oppenheimer. (SOC 10.) As such, even considering an investment with Southport Capital to be an indirect investment with Woods, it would be in his role as a Southport Capital-associated person, not as an Oppenheimer-associated person. *See NYLife Sec., LLC v. Duhame*, No. 20-cv-07413-JSC, 2020 WL 7075599, at *3 (N.D. Cal. Dec. 3, 2020) (finding that NYLife broker gave bad investment advice, not as a NYLife-associated broker, but independently as a friend, and thus NYLife was not obligated to arbitrate pursuant to FINRA).

  Second, no evidence suggests that Ginn's Horizon investment with Southport Capital was in any way linked to Oppenheimer's "FINRA-regulated business activities." *Goldman*, 747 F.3d at 741. Woods sold Horizon through Southport Capital in 2016. (SOC 10.) He was also registered with Oppenheimer in 2016. (*See* Compl. ¶ 14.) This overlap alone does not connect Southport Capital's Horizon investment program to Oppenheimer's FINRA-regulated business activities. *See*

7

*NYLife*, 2020 WL 7075599, at *3 (finding NYLife broker's independent bad investment advice unconnected to NYLife's FINRA-regulated business activities, and thus NYLife was not obligated to arbitrate pursuant to FINRA). It is not enough that Southport Capital offered similar investment and securities services to those offered by Oppenheimer; the arbitral dispute must arise in the course of the member's—here, Oppenheimer's—investment banking and securities business activities. *See COR Clearing, LLC v. Ashira Consulting, LLC*, No. 5:15-cv-2299-JGB (KKx), 2016 WL 7638177, at *4 (C.D. Cal. Jan. 13, 2016) (reasoning that simply being the same type of investment and securities business activity did not connect the disputed transactions to a FINRA member's business activities). "To find otherwise would unreasonably make [Oppenheimer] and other FINRA members the guarantors of all of their registered representatives' business dealings, however unrelated" to Oppenheimer's "investment or brokerage services such dealings may be." *See Berthel Fisher & Co. Fin. Servs. v. Frandino*, No. CV-12-02165-PHX-NVW, 2013 WL 2036655, at *8 (D. Ariz. May 14, 2013).

Finally, Ginn argues he is a customer of Oppenheimer, by virtue of his investment with Woods via Southport Capital, because the customer of an associated person of the member is necessarily also a customer of the member. (Opp'n 11–14.) Ginn draws this rule from an Eleventh Circuit decision that predates *Goldman* by a decade. (*See id.* at 11–12 (quoting *Multi-Fin. Sec. Corp. v. King*, 386 F.3d 1364, 1370 (11th Cir. 2004).) Although the Ninth Circuit did not consider this issue in *Goldman*, *Goldman* is nonetheless instructive. In *Goldman*, the Ninth Circuit was persuaded by the reasoning of the Fourth and Second Circuits in crafting its definition of "customer." 747 F.3d at 739–41. Considering those Circuits' decisions now, the definition of "customer" has been constrained, not expanded. *See Abbar*, 761 F.3d at 276 (requiring an account with or purchase from a FINRA member); *Cary*, 709 F.3d at 388 (requiring purchase of commodities or services from a FINRA member). In light of the language of the Ninth Circuit's definition, and the Fourth and Second

Circuit's definitions and reasoning, the Court declines to expand the definition of "customer" as Ginn proposes.

In summary, Oppenheimer is likely to succeed in showing that it cannot be compelled to arbitrate Ginn's claims in the FINRA Arbitration.

**B.     Irreparable Harm, Balance of Equities, & Public Interest**

The remaining *Winter* factors weigh in favor of an injunction.

Oppenheimer will suffer irreparable harm if it is forced to arbitrate disputes that it has not agreed to arbitrate because it would be deprived of "its right to choose a forum." *World Grp. Sec. v. Tiu*, No. 2:03-cv-2609-NM (SHSx), 2003 WL 26119461, at *7 (C.D. Cal. July 22, 2003); *see also, e.g.*, *Mitchell*, 2023 WL 2428404, at *6 ("Oppenheimer also correctly argues that it will be irreparably injured if it is forced to arbitrate when it does not have to.").

The balance of equities also favors Oppenheimer. The potential harm to Ginn from an injunction is that his ability to arbitrate against Oppenheimer will be "delayed, not precluded." *NYLife*, 2020 WL 7075599, at *4 (citing *COR Clearing, LLC v. LoBue*, No. 5:16-cv-00909-JGB (KKx), 2016 WL 9088704, at *4 (C.D. Cal. June 16, 2016)). As such, the likely irreparable harm to Oppenheimer outweighs the potential harm to Ginn. *See Mitchell*, 2023 WL 2428404, at *6 ("A delay in the arbitration does not appear to impose any specific harm or inequitable outcome.").

Finally, "there is a strong judicial policy against compelling arbitration when the parties have not agreed to arbitrate a dispute." *See World Grp. Sec.*, 2003 WL 26119461, at *8 (approving plaintiff's argument, based on this judicial policy, that the public interest is served by enjoining unconsented arbitration); *see also AT & T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 648 (1986) ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). "Accordingly, enjoining [Ginn] from pursuing arbitration claims against [Oppenheimer] where there is no agreement to arbitrate furthers this judicial policy and the public's interest in the fair and proper resolution of claims." *Id.*; *see also*

*Mitchell*, 2023 WL 2428404, at *7 ("While the FINRA rules are intended to help investors, they should not be applied in a manner that would coerce FINRA members to arbitrate claims when they do not have to."). This factor also favors Oppenheimer.

In sum, in addition to showing it is likely to succeed on the merits, Oppenheimer establishes it is likely to suffer irreparable harm absent an injunction, the balance of equities tips in its favor, and an injunction is in the public interest. Thus, all *Winter* factors favor issuing the requested injunction.

## C. Bond

As there is no realistic likelihood of harm to Ginn from enjoining the FINRA Arbitration, the Court finds that no bond is necessary. *See* Fed. R. Civ. P. 65(c); *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."); *see also Mitchell*, 2023 WL 2428404, at *7 (finding no bond necessary for injunction precluding FINRA claimant from arbitrating against Oppenheimer because "[t]here appears no realistic likelihood of harm to Defendants from issuance of the injunction").

## V. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Oppenheimer's Motion for a Preliminary Injunction. (ECF No. 16.) Ginn and any successor trustee of the Ginn Trust are hereby enjoined from pursuing claims against Oppenheimer in the FINRA Arbitration, pending disposition of this action. No bond is required.

**IT IS SO ORDERED.**

August 7, 2023

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**

10